With the Court's permission, I'd like to reserve five minutes for rebuttal. Certainly. I'll try to keep track of your time, and I'll try to remind you. Thank you. May it please the Court, this case turns on the legal consequences of medical disagreement. The district court below concluded that there is a division of opinion among highly qualified experts about the necessity for and safety of the disputed method of abortion at issue. The appeal presents the question whether that division of opinion compels judgment for the government under the line of cases including Turner v. FCC and Jones v. United States, or alternatively, whether the division of medical opinion compels judgment for the plaintiffs under the plaintiffs' broad reading of Stenberg v. Carhartt. Do you disagree with the district judge's assessment of expertise? That is to say, the district judge was quite careful in saying that she thought that some of the government's expertise was limited to their areas of practice. We do disagree with that assessment, most fundamentally because we think the weighing of credibility and expertise and so on is something properly vested with the entity that has fact-finding capacity. My question is a little bit different. Someone can testify as an expert witness or can testify as some other kind of witness. She limited several of the government's expert witnesses to a fairly narrow range of expertise. Do you disagree with that judgment as to what they were expert in in the evidentiary courtroom sense? We haven't challenged the evidentiary rulings. The government's experts were permitted to testify on and did testify on the comparative safety of the procedures, which under Stenberg is the factual question to be decided. To the extent that the district court said, well, there are differences in expertise between OBGYNs on the one hand and surgeons on the other hand, we don't dispute that. But I don't think that observation can categorically support exclusion of the judgment of OBGYNs on something that in the context of Turner is a trial to assess the reasonableness of the congressional judgment on substantial evidence review. The surgeons do the procedure. That's an advantage they have. On the other hand, the OBGYNs treat women, manage pregnancies, treat women who have difficult pregnancies, deliver babies, are experts in the relevant anatomy, the development of the fetus and so on. They provide follow-up care, unlike many of the surgeons, and therefore can assess long-term complications, which is one of the concerns at issue here. So you have, Judge Fletcher, you have expertise in both categories of people, and I don't think it is plausible to say that someone like Dr. Lockwood, one of the government's experts, who is chairman of the OBGYN department at the Yale Medical School, is not fit to deliver significant opinions on the issues presented in this case. So to that extent, we do disagree with the district court. But most fundamentally, we think the weighing of the competing evidence among those doctors goes far beyond the permissible scope of substantial evidence review. Let me back up a little bit on a broader question. If Stenberg, in fact, and Casey before it, established a per se rule that there must be, to be constitutional, a statute must have a health exception, do the findings matter at all, regardless of whether the district court did it or we look at congressional findings? I think you would have to construe Stenberg as doing two things. Number one, establishing a per se rule regardless of the facts. And number two, applying that principle even to a situation where there is a federal statute and there are congressional findings. Right. We've said, at least in Wasden, that we've interpreted Stenberg in our court as applying a per se rule. And the Eighth Circuit and the Fourth Circuit seem to say the same thing. Why aren't we bound by Wasden, which is a prior panel decision of this Court? You did use two reasons. First, you did use that articulation in Wasden, but in the immediately preceding sentence of that opinion, you said a health exception is necessary if, emphasis on if, there is a need for it. So it's a per se rule if there's a need for it, but that doesn't address the factual question whether there is a need. Second. But before we leave that, the Supreme Court did address that in Stenberg. Why shouldn't we wait until the Supreme Court hears the evidence or wants to reconsider its opinion in that? Because in Stenberg, based at least in part, it looked at the evidence in the Nebraska case. Well, if you choose to hold this case pending our cert petition in the Nebraska case and what might or might not be a grant of certiorari in that case, that would be fine with us. I think that's fundamentally a judgment for the Court about its own best use of resources. We certainly wouldn't object to that. Well, Stenberg relied on Casey, so it's not just Stenberg that talks about the fundamental constitutional rule here. Well, it did rely on Casey. To the extent Casey is relevant to the questions presented here, I think it cuts in favor of the government, because the one thing that Casey made clear is that strict scrutiny is not the relevant standard for review of abortion restrictions. And one of the arguments on the other side made against application of Turner is the argument that Turner does not apply to strict scrutiny. That's an open question at the Supreme Court level, but we know Turner does apply to intermediate scrutiny. Turner itself was intermediate First Amendment scrutiny. Rostra v. Goldberg was intermediate equal protection scrutiny. We know Turner applies to intermediate scrutiny, and we know from Casey, as this Court said in the Tucson women's v. Eden case, we know that Casey establishes a standard of review akin to intermediate scrutiny. So I think the effect of Casey is to take off the table the argument that one can't apply Turner here because of strict scrutiny considerations. Turner was a constant neutral First Amendment case, and I think even under Casey you would say that there would be heightened scrutiny, if not more heightened scrutiny than you would have in Turner. You'd have to agree. I mean, I think, I mean, I don't know how finely one can slice things. We're talking about the genus of intermediate scrutiny, and it seems to me that's the relevant universe. And we know, as I said, Turner is a First Amendment case where we know content neutral restrictions get something that the Court has called intermediate scrutiny. We know from Rostra that Turner-like principles apply to sex-based discriminations, which get intermediate scrutiny. And we know from Jones, Jones v. United States, that Turner-like principles apply in a due process context where the constitutional right at issue in Jones was the most fundamental of all due process rights, the right not to be physically imprisoned through a commitment. Supreme Court said that is an important. We know in Morrison, for example, how we, the courts will reexamine congressional findings in sex-based cases. We do, but in Morrison, the fault that the Court, the reason the Court did not find those findings dispositive was that they, they addressed the fact that the Court had effects on interstate commerce in a context where Congress was regulating noncommercial activity and the legal theories of, of aggregation of, of what the Court described as heaping inference upon inference. Kennedy. Unlike in this case, I suppose. But the Court takes different views of the significance of findings depending on the context of the case and the nature of the issue. And I guess one of the problems we have is to anticipate how the Court will view the role of findings in a case involving abortion. That's true, Judge Reinhart. We don't have a Supreme Court case addressing congressional findings in the context of abortion. So I think the most analogous cases we have with respect to congressional findings are the ones I've been just discussing with Judge Thomas. But your observation that we don't have a Supreme Court case addressing the issue of congressional findings is precisely our argument why Stenberg is certainly the beginning of the legal analysis, but can't possibly be the end of the legal analysis, as our opponents suggest, under which their burden of prevailing would be nothing more than to say Stenberg was decided and we get judgment on the pleadings. Could you, so far this is really going to the health exception issue. Could you address the undue burden issue, which is, of course, a separate question under Casey and under Stenberg? It is separate. The problem in Stenberg that the Court found with the Nebraska statute was that that statute defined the prohibited procedure in a way that was both vague enough and potentially broad enough to encompass the D&E method of abortion. And the Court said, of course, D&E is the leading second trimester method. It's very safe. It's overwhelmingly common. And to the extent a statute precludes that method of abortion, that's an undue burden. Congress in this statute didn't thumb its nose at the Supreme Court. It specifically responded to that aspect of Stenberg by precisely and narrowly defining the prescribed procedure, not by vague reference to delivering a substantial portion of a fetus, like the Nebraska statute, but rather by defining specific anatomical points to delineate between, on the one hand, the disarticulation that one sees in a classic D&E, and on the other hand, the intact delivery that characterizes the procedure alternatively described as partial birth or D&X or intact D&E. So there's a clear line of demarcation. And, well, there may be a clear line of demarcation in terms of what the statute defines as a partial birth abortion. Right. But Judge Hamilton's fairly careful opinion says that a doctor actually performing an abortion is going to have trouble knowing as he or she goes through the procedure what that's going to end up with, and the doctor may end up finding himself or herself in a position where at the end of the procedure or near the end of the procedure, in order to do it properly to protect the health of the woman, he's going to engage in a criminally prohibited act. There's a vagueness concern, and there's an overbreadth slash undue burden concern. With respect to the vagueness concern, the clarity solves it. Your question, I think, goes to the ‑‑ Well, the overabortion problem is undue burden, whether you call it vagueness, whether you call it something else. And then, as you point out, there is a further question of what are the practical consequences for the doctor in the operating room. We have two ‑‑ the doctor goes in, and we know that he can try to disarticulate through a classic D&E, or he can try, he or she can try to take the fetus out intact. What we know from the record about the practical medical facts is that disarticulation is difficult. If a doctor tries to perform an intact extraction, the partial birth procedure, the vast majority of times, a doctor wanting to do that procedure cannot succeed. It's a hard thing to do, precisely because the fetal tissue is not well formed. There is no reason on this ‑‑ there's no reason to think that a doctor trying to disarticulate can't disarticulate. So if he wants to do ‑‑ Are you saying that if you start out trying to do an intact version, that you're likely to end up doing a disarticulated version? So you start out intending to commit a crime, but if you do what is likely to happen, you won't commit the crime. That's right, but more fundamentally, Judge Reinhart, if you start out intending to disarticulate, to do the D&E, the classic D&E, the overwhelming likelihood is that you will ‑‑ the doctor will succeed, and if by accident, somehow the doctor manages unintentionally to pass the specified anatomical point, that situation is carved out by the specific intent requirements built into this statute at every turn. Is there any reason for a doctor to do the intact version other than his medical judgment that it's safer? There are medical arguments on both sides, and there's reasonable ‑‑ Sure there are, but doctors may disagree. But is there any reason for a doctor to do, as you describe these alternatives he has, he can do the operation with a disarticulated version, and he's perfectly fine under the law, or he can do the more difficult process of trying to extract it intact. Is there any reason for a doctor, other than for medical safety, to do the intact version? Because he believes it. It may not be safer, but because of his medical judgment that it is safer? There are safety arguments on both sides. The one thing we know ‑‑ I'm not asking which is correct. I say there are safety arguments on both sides. Dr. A thinks it's safer to do the disarticulated version. He'll do that. Now, Dr. B thinks it's safer to do the intact version. Okay, he'll do that. Is there any other reason that Dr. B would do this version other than that he believes it's safer? Do the disarticulation? No. Do the intact? No, I think ‑‑ and I think there are safety judgments pro and con in the question. There's nothing in the record that would indicate other than a health or safety reason to do an intact, right, to make that judgment? There are health and safety reasons for the statute. There are also ethical reasons. No, I understand that, but I'm just following up on Judge Reinhart's question that I didn't see anything in the record that would indicate that physicians perform an intact version other than for ‑‑ other than because they believe that it's best for the health or safety of the other. No, I think there are ‑‑ Just a difference of judgment. There are differences of opinion with respect to comparative safety measured against a baseline of a procedure with a 20‑year track record of being, in the words of plaintiff's own experts, hands down safer than childbirth. One final point, just to close the loop on Wasden. I said there were two reasons. The second reason is that Wasden did not involve a federal statute or congressional findings, and so to say that there is a per se rule in a way that would preclude other district court judges or other state legislatures from reaching different factual judgments, producing strange anomalies in the laws, as Judge Easterbrook explained in the Hope Clinic case, all of that set of concerns do not apply where there is a uniform federal statute, the national legislature has resolved fact questions, the courts review that resolution for substantial evidence. If the courts disagree on whether or not there is substantial evidence for the congressional judgment, there's a circuit split and the Supreme Court resolves that issue on a uniform national basis. One quick question on the fact finding before you sit down, if you don't mind. Congress made the determination in passing this that this procedure was never necessary. It also provided a life exception. How can you reconcile those two? I think the life exception is unnecessary given the congressional findings with respect to health. I don't think that the fact that a statute affords more protection than would be constitutionally necessary is a basis for striking it down. I see I've used up all my time. I thank the Court for its attention. Good morning, Your Honors. May it please the Court. My name is Eve Gardner, and I represent both the Planned Parenthood appellees and I'm also representing the city and county of San Francisco in the argument this morning. I'd like to first address the undue burden issues in this case. But actually, before I do, I would ask that as Judge Hamilton addressed all of Plaintiff's We, too, would ask that the Court address each of our claims just because this may, in fact, be the case that goes to the Supreme Court, and I think it would be helpful for the Supreme Court to have this Court's thinking and analysis on all of our claims. With respect to the undue burden claim, as Judge Hamilton found, this law is broad being D&E and induction. I want to address that there may be some common misperceptions about what we mean when we talk about a ban on so-called partial birth abortion. People may believe that this is a law that only applies very late in pregnancies, but in fact, what the testimony was is that this is a law that applies throughout the second trimester. There's obviously no gestational age limit in the statute itself. The testimony here, and Judge Hamilton specifically found, that all of the procedures done by all of Plaintiff's 13 experts were performed in the pre-viability time frame. And in fact, Planned Parenthood only does abortions prior to viability. So we're not talking about post-viability abortions. We're talking about pre-viability abortions. And by that, you mean there is no question here at all of any abortion in which, if the fetus were permitted to come into the world intact, that the fetus would survive. That's correct, Your Honor. Another misperception, which actually Mr. Katz's argument tends to further, is the idea that physicians who perform intact D&E abortions are somehow different than other physicians, are somehow different than the physicians that testified on behalf of the government. In their case, that perhaps they're less qualified physicians, less well trained. But in fact, the testimony below made it absolutely clear that the doctors that sometimes prefer intact D&E are at the absolute height of the OBGYN profession. We had 11 experts who testified. These are physicians, all of them OBGYNs, affiliated with some of the most elite medical institutions in this country, UC San Francisco, UC San Diego, Cornell, Columbia, Northwestern, California Pacific, and I'm sure I'm forgetting some. Not Yale. Not Yale, but no, Your Honor. Actually, you raise a good point, because Dr. Lockwood, the government expert who used to be the chair of the Department of OBGYN at NYU, while he was at NYU, intact D&Es were actually performed in the abortion service at one of his hospitals. And he had no objection to that, because he understands that even if he personally would not choose to do intact D&Es, and he actually personally doesn't do any abortions because he personally is opposed to them, but he understood that the physicians he employed thought that it was safest, and he respected their medical judgment to do so. He now is the chair of the OBGYN department at Yale. He's starting up an abortion service, or at least at the time of this case he was, he may already have done so. And he testified that it may well be that the abortion service at Yale would provide intact D&Es, and he would have no problem with it. Again, he respects the medical judgment of the well-trained physicians that he employs. So, and in fact, the doctors that testified on behalf of plaintiffs are well-regarded not only in the OBGYN world generally, they're well-regarded by the government's experts, Dr. Bose, Dr. Lockwood. Several of them specifically said that they respected several of plaintiffs' experts. Dr. Paul, one of our experts, is the author of the leading text on abortion. Kennedy. Do you really think that these, the validity of the statute should depend from circuit to circuit or court to court on which experts are produced in the trial? Absolutely not, Your Honor. The legal test here is, in terms of the health exception, is substantial medical authority. But I think in terms of the undue burden, and that's something that, obviously, the weight of the physicians and their training, to some extent, would play into whether or not it is substantial medical authority. But with respect to the undue burden question, Your Honor, in all honesty, how physicians do abortions does vary. Not everyone does an abortion in the same way. There might be physicians in this country that do D&Es in a way that wouldn't run the risk of violating the statute. But the fact is, as Judge Hamilton found, the 11 physicians that testified for the plaintiffs all do D&Es in the way that would violate the terms of the statute. And that's a finding, again, that this Court needs to be deferential towards, especially since there was no conflicting evidence submitted by the government. And then, again, I think another misperception, and I think this was addressed a little bit in Mr. Katz's argument as well, is there really is not a clean distinction between D&E, where the fetus ends up being disarticulated in the process, and D&E, where the fetus is removed intact. Judge Hamilton specifically found that intact D&E is simply a variant of the procedure The doctor, Dr. Chason, who's the director of high-risk OBGYN at Cornell and was one of our experts, said the procedure is in all cases the D&E. Sometimes it may result in intact extraction. Sometimes it may result in disarticulation. And experts on both sides agreed that when a doctor begins a D&E, they don't know if it's going to result in an intact extraction or not until the procedure's over. And Dr. Westhoff, who teaches at Columbia, said it's not until the procedure's over that we know if we have an intact D&E or not. And, in fact, the government's experts, Dr. Bose and Dr. Lockwood, Dr. Lockwood, of course, from Yale, and Dr. Bose from the University of North Carolina at Chapel Hill, agreed that the best way to do a D&E abortion is to try to reduce the amount of instrumentation to the uterus, which means removing the fetus as intact as possible. So the government tries to say that the intent requirement in this law is the cure-all to the overbreath. But, in fact, as Judge Kopp, the district court judge in the Nebraska case, found, physicians have a dual intent because they don't know if the procedure is going to result in intact extraction or disarticulation. When they begin the procedure, they have a dual intent, and he found that the specific intent requirement that the government urges the court to adopt would be met in some D&Es because of the fact that physicians try as much as possible to achieve the intact extraction, even though, as this Court acknowledged, often they won't succeed. But the other thing that's important here is this is a felony statute. Again, these are doctors at the height of their profession, at leading medical institutions in this country. If this law is upheld on the grounds that, oh, D&Es aren't really covered, which of these doctors is going to put his life, his career on the line in the hope that down the road some jury is going to say, oh, well, he didn't really intend that? There's a significant chilling effect to this law, the way it's currently drafted. In addition, as Your Honors recognize, there's also – plaintiffs have also claimed that the law is unconstitutionally vague. I won't go into that in detail, but I did want to mention that in addition to some of the other reasons that we had suggested in our briefs related to the vagueness of the statute is the fact that this law only prohibits intact D&Es or so-called partial birth abortions that are in or affecting interstate or foreign commerce. So even if a doctor could be certain that he would not be prosecuted for performing a D&E because he didn't have the requisite intent for some – on some theory, how could a doctor ever know whether the abortion that he's doing at that moment was in or affecting interstate or foreign commerce? Have you made an argument under Morrison? No, we have not, Your Honor. But we have asserted – we have asserted a vagueness claim that that language that was litigated below, that the vagueness of the in or affecting interstate commerce is an additional reason for striking the law down on the vagueness grounds. Now, turning now to our health exception claim, it's important, of course, to understand that this is an alternative claim. Our main claim is that this law is so broad that the safest, most common abortion methods would be banned. The health exception claim assumes for the sake of argument that, in fact, the law is not that broad, and it bans only D&Es performed with intact extraction. So do you read Stenberg as establishing a per se requirement? Your Honor, we read – we read Stenberg as saying that as a per se rule, the test is substantial medical authority, that where there's substantial medical authority supporting the idea that banning intact D&E would endanger women, there must be a health exception. I think that in order for the Court to find that a health exception is not needed, the government would have to come forward and show the Court that something different had occurred since Stenberg was decided that would make that – the Stenberg rule inapplicable here. And does that have to be determined on a case-by-case basis throughout the many districts' courts of the United States? Well, Your Honor, I think that the Supreme Court's finding on the record before it, which is almost identical to the record that was presented here, although the record in this case is, in fact, much more significantly supportive of the safety of intact D&E than the Stenberg record. But I think as long as the evidence is the same, the Court has – is compelled to find that substantial medical authority supports the need for a health exception. Did I answer your question? I understand your position, yes. Okay. And as I – as I said, the record here has all of the same evidence that the Supreme Court looked at in Stenberg. Did the Supreme Court look at more evidence than was in the district court record? It did, Your Honor. The Supreme Court in Stenberg looked at medical articles that were cited throughout its opinion, including the medical treatise that was edited by plaintiff's expert, Dr. Paul. They looked at the ACOG amicus brief and the amicus brief that were – amicus briefs that were submitted by other medical organizations. And they also looked at district courts. But the circuits throughout the country can – would be free to look not just at the record made by the district court, the decision they're reviewing, but the circuits should each look at whatever literature or law there – or facts there are relating to this practice that are public knowledge. Your Honor, maybe I wasn't clear earlier. What I think is that after Stenberg, the record is really fixed in light of – in light of the substantial medical authority as evidenced by ACOG's position, as evidenced by medical treatises, as evidenced by the findings in district courts around the country, there is substantial medical authority that supports the need for a health exception. That – there's no need now for courts to reexamine that question unless the government comes forward showing that something's changed. And I mean, I think to be fair – Well, if Congress has reexamined the question and reaches a different conclusion, then what? Well, Your Honor, Congress – Congress looked at the exact same evidence that the Supreme Court had before in Stenberg and reached a different conclusion. And that's – that's not legally acceptable. Congress can't – Well, we do have to take legislative findings very seriously, though. Of course – of course, that's – that's correct, Your Honor. If we take – if it comes down to a question of facts determined between how – what the district court does and what Congress finds, it puts us in a rather awkward position for just arbitrating who's right. Right. Well, there's several respects, Your Honor, in which – in which – in which this Court simply can't defer to the congressional findings here. First, the congressional findings, as I said, they're in blatant disregard of the Stenberg holding. They were designed specifically really as a vehicle by which Congress hoped that future courts would overturn Stenberg. Now, that hasn't happened yet. Stenberg is still the – is still the law. This was – none of the government's cases in which they talk about congressional deference occurred against the backdrop of a recently decided Supreme Court decision that's diametrically opposed to the congressional findings. Congress had before it no new evidence that the Stenberg court didn't have, and yet it reached an opposite result. And I don't think it's because the – it wasn't that they had a different quality of evidence. It wasn't that a new study had been enacted or been performed that showed new data. They took the exact same evidence that the Supreme Court had, and they reached a different result. It was a – in direct defiance of the Supreme Court's holding. In addition, the holding – Let me – let me – this is – I'm following on with your – from your comments and from Judge Thomas's question. Is there a relevant difference here? In Stenberg, the Supreme Court was dealing with a question that had been decided by the state legislature, and whatever deference might have been owed in Stenberg was owed to the findings of a legislative body within a state. Is there some different level of deference that either this Court or the Supreme Court should give if it's a congressional finding? Your Honor, we think not. And here – there's several reasons why that is. First, the rule – the constitutional rule established in Stenberg is that where there's – where there's substantial medical authority on one side of the question, even if – even if there's other doctors with a different view, you err on the side of protecting the individual woman's health. If there's disagreement, you err on the side of the woman. Now, in Turner, the – the Court reached the precisely opposite result, which is where there's division of – of – among professionals about how, in that case, how the must-carry rules would affect the local broadcast industry. They said, well, you defer to Congress. But that's – that's not what you do in – in a case like this, especially when Stenberg says you err on the side of the woman. And, in fact, several of the government cases support our point. For example, in the Ussery case, the case about the – the whether or not X-rays can diagnose pneumoconiosis, the Court said the burden of the possibility that Congress is wrong should not be on the disabled minor. That's exactly the – that's exactly the situation here. In addition, in one of their other cases, the Lambert case, the case about banning doctors from – for prescribing medicinal uses from alcohol, there, even though it was only a minor fraction of doctors that said that alcohol had medicinal use, Congress still enacted an exception to the law that allowed doctors to prescribe alcohol in small quantities on a certain number of occasions, again, recognizing that if somebody is going to be wrong, where there's clinical disagreement among doctors, if somebody's going to be wrong, it shouldn't be the individual person in a compromised health situation who has to bear the burden of it. And that's a fundamental aspect of Stenberg, and it's one that's diametrically opposed to Turner. Well, the two cases may well be in tension, but the – we still don't have a case that says Turner does not apply across the board, do we? Well, that's – We have to – we may be able to imply that from Stenberg and perhaps some of the legislative fact-finding and deference, then we do have Turner that you have to overcome. Well, Your Honor, I – you know, I agree with you that the Supreme Court has never considered the specific question of congressional findings in the context of an abortion statute. But it is true that Turner itself has really been limited to its particular facts. If you look at Turner, the Court repeatedly said that the deference that it's giving to the congressional findings is deference to Congress's predictive judgments. It uses the word predictive over and over again. Now, the judgment that's being made here in this case is not a predictive judgment. It's a clinical judgment, a medical judgment. And in fact, in the McConnell case, the Campaign Finance Reform Act, the Court discusses Congress's findings at length, but it only specifically applies Turner and says it's going to give deference under Turner in the specific context where it says that they're – that Congress made a prediction as to how soft money donors might try to evade the law. In addition, most of the cases, including many of the government's cases, say that you give Turner deference in an area where Congress has expertise, where Congress is reviewing vast amounts of empirical data and making a legislative judgment in the context of a broad regulatory scheme. None of those situations are present here. It's not a predictive judgment. There's not vast amounts of data. In fact, it is – the fact is there's no data on this. It's just a matter of doctor's judgment. This is not part of a broad regulatory scheme. In fact, it's an absolutely unprecedented attempt by Congress to regulate how doctors perform medicine. And it's obviously not an area in which Congress has expertise. But of course, Your Honor's right. If – and we, as I said earlier, we would ask that the Court go to the next step, which is what if Turner does apply here? We don't think it does, but what if it does? Well, Turner says you only apply deference to legislative findings that are reasonable and supported by substantial evidence. But that's – we simply don't have that situation here. The district court went in detail through each of the congressional findings and showed point by point how each of the findings was simply unsupported either by the record in Congress or by the testimony that was presented to her. And I'm not going to go through each of the findings, but I think two of them are important to look at. Really, in light of the fact that the relevant legal test is whether there's substantial medical authority, not absolute proof, the only directly relevant finding is the first finding, which is where Congress says that there's a moral, medical, and ethical consensus that so-called partial birth abortion should be banned. Really, that's the only one relevant, because if there truly were a consensus that this so-called procedure would be banned, then it would fail Stenberg's test. But, in fact, this finding is almost ludicrous, and, in fact, Mr. Katz has repeatedly said today that there are arguments on both sides of the safety question. For Congress to say there's a consensus one way is tantamount to what then-Judge Thomas called calling black, white, or freedom slavery. You know, every major medical organization in this country either opposed this ban or took no position on this ban. In light of that, for Congress to say there's a consensus against performing this procedure is simply untenable. And the other set of findings, because there are multiple findings, that we take very seriously are Congress's findings that intact D&E is somehow risky. If that were true, if intact D&E did pose risks to a woman's health, that's something Planned Parenthood would have to take seriously, because our whole goal is to enhance women's health. And I actually just, Judge Reinhart, to respond to one of your questions that I think, Judge Thomas, you asked also of Mr. Katz, is there any reason why a doctor would do an intact extraction other than his or her medical judgment that it's the best? And the answer is simply no. Dr. Chaston explicitly addressed that in his testimony. He said, I take no pleasure in performing intact extraction versus disarticulation. The only reason I do this is that it's my best judgment that it's safest for my patients. And, in fact, there is utility to this procedure. As even Dr. Cook, one of the government's experts that Judge Hamilton found to be not credible because he's so biased against all abortions and all D&E abortions by every method, Dr. Cook recognized during his cross-examination, we were talking about the fact that this is a law that only applies if the fetus is living. So if that's true, if there was, if the abortion is being done because there was fetal demise in utero, which is a not common but not uncommon situation, then a physician could empty the woman's uterus using the intact extraction method, and they wouldn't violate the statute. So if Congress really thought that performing intact D&E was risky to a woman, frankly, they should have banned it whether the fetus was living or not living, because it would still be risky to the woman. And in cross-examination with Dr. Cook, he agreed that that was true, and he said that he thought that the reason Congress didn't ban it if the fetus was dead is that this is a procedure that has utility in some circumstances, and he thought doctors should be able to use it, which completely undercuts his, the view that he expressed earlier in his testimony that there are risks to it.  Within a minute, please. Yes, Your Honor. I think, in summary, doctors need to be able to exercise their clinical judgment. Abortion, like any medical procedure, is risky when doctors are prevented from doing the procedure in the way that's safest, that's the way that they were trained to do it, that they think is the best. Dr. Westhoff testified about changing her practice before the TROs in this case were issued to avoid the reach of the law because there was no legal protection, and she ended up with a significant complication. Again, when doctors can't do what they think is safest, women's health is going to suffer. So. Thank you, counsel. Thank you. Counsel, we'll give you five minutes for rebuttal. Thank you. With respect to the scope of the Turner line of cases, the rationale expressed by the Supreme Court in Turner is that Congress is due respect as a co-equal branch of government in making fact findings incidental to Federal legislation, and that Congress is better situated to amass and weigh evidence that bear on empirical questions. Nothing in that rationale restricts itself either to economic judgments or predictive judgments as opposed more to empirical judgments. Consistent with that point. Well, what is our role if Congress says that everybody agrees that something is never necessary, and there's all kinds of facts before Congress and in the record in the court, and out in society, and in Supreme Court decisions that says the opposite, what do we do? Well, you review the congressional finding on necessity for substantial evidence, and you think. No, but it says everybody agrees it's never necessary, and you're confronted with the record that says here are well-established people who say it is necessary. I don't think you need to affirm, to go so far as to affirm the congressional finding with respect to consensus, because Congress made a narrower finding that in its view, this procedure is never necessary and less safe. We can assume, then, that there's a substantial body of medical evidence that says it is safer and necessary, and Congress says, in our view, it's not medically necessary ever. Under that, we could assume those two things, and then how do we decide that? You would have to ask yourself whether Congress's judgment that the procedure is never necessary is itself supported by substantial evidence, and the best confirmation of substantial evidence in this record is the district court's own statement, which we agree with, that the highly credentialed, qualified experts who make these judgments disagree. Are you basically saying that even if there is a substantial disagreement in the medical community as to whether this is necessary, Congress has the authority to ban it? Precisely. The essence of the Turner line of cases is that, as the Supreme Court said explicitly in the Jones case, is that Congress, with respect to empirical questions, Congress may act in the face of uncertainty. That's the Supreme Court's formulation. Subject to substantial evidence review, but on the hypothetical you posit, with substantial evidence on both sides, by definition, there is sufficient support for the congressional judgment. That's the way, for instance, Judge Reinhart, if you were reviewing agency fact-finding under a substantial evidence standard, and there were a lot of evidence on both sides. In an ordinary case, yes. In an abortion case, I'm asking. Where the court has said, I thought, that if there were substantial medical evidence supporting the medical necessity to protect women, that Congress could not ban that. You disagree with that? Which brings us then to the question not of the scope of Turner, which we think covers this situation, but the scope of Stenberg. And, no, we don't think Stenberg addressed that question for the very simple reason that in Stenberg, there was neither a Federal statute nor any congressional findings. I'm having trouble reconciling your view of what deference the court owes to congressional fact-finding here, or your reading of Turner, with what the Supreme Court has done with respect to congressional findings of various statutes, finding impacts on interstate commerce. How do you reconcile the Supreme Court's, I think, rather marked unwillingness to defer to congressional findings of impact on interstate commerce with the view you're now espousing? The Supreme Court in cases like Morrison, you have to assess, the Supreme Court has held as a legal matter that, rightly or wrongly, as a matter of commerce clause jurisprudence, that when Congress imposes restrictions on activity that is not commercial, like private violence or gun possession in the cases you probably have in mind, as opposed to activity that is commercial, like selling a commodity like weed or marijuana in a different line of cases, when you're in the world of noncommercial activity, the Supreme Court's governing legal rule is that you can't have aggregate intrastate impacts along the lines of a wickered versus... I don't mean to put words in your mouth, but where I think your answer is going is that you're telling me that the Supreme Court gives less deference when we're talking about a particular area here defined as noncommercial activity that may or may not affect commerce. I think you're saying what I just said, sorry if I misheard, but you're stating the rule, but what I'm saying is the Court is saying we're not going to defer when it's a noncommercial activity. Congress might have made these findings that there are impacts on interstate commerce, but if it's a noncommercial activity, we've got an almost per se rule that we don't defer. Now, in another area, for example, abortion, do they defer? In another area, for example, free speech or must carry rules, do they defer? I think you're telling me, in answer to my question on Morrison and Lopez, well, you know, that's different. There are different levels of deference depending on the subject area being regulated. There are different questions of relevance depending on the content of the legal rule. I think that's where we started this argument about an hour ago on the difference that the Court seems to give with respect to congressional findings depending on the subject matter, but I think we're back where we started. Do you have something you want to add? No. Well, I guess one question. Now that we're on interstate commerce, how can a physician who practices charity care at a San Francisco hospital for the county determine whether or not his activities impact interstate commerce? I think that is a noncommercial transaction in trust state. First of all, I will answer the question, but I'd just like to note there has been no commerce clause claim, and it doesn't go to Article III jurisdiction, so we would obviously be in a better position to have answers had this point been raised. But I think the answer to your question is that the line of commerce clause attack you're suggesting is like the line of commerce clause attack on the statute at issue in Raich, where this Court... In Raich we had an overarching drug statute that had been ruled constitutional in terms of its reach. But I'm not arguing the commerce clause here because it's not the case. Although I think it's an interesting question because there are no congressional findings on the impact of interstate commerce. The findings seem to be it's a rare occurrence. There's no indication that people cross state lines. It's almost exclusively now an intrastate activity. But my question was really directed to their argument on vagueness, that how is a physician who performs charity care in a San Francisco hospital supposed to know whether he or she is violating the statute, because the element is interstate commerce? Is it the position of the government that every, no matter where it occurs, no matter what the impact on interstate commerce, that in fact any time a physician performs this procedure, it's a felony? I'm not sure I'm in a position to have a final position on a claim that wasn't raised. But I think the point I was trying to make about Raich is that for purposes of commerce clause analysis, you have to look to the category of regulated activity. Kennedy. What's your take on Thomas' question about is a doctor performing that operation? A, is he covered, and how does he know? I think the jurisdictional element would be met because, would very likely be met because this statute That just turned into very likely instead of is. I think it's an is. Let's say it's a free clinic operated here in San Francisco, totally intrastate, because as the city and county of San Francisco have alleged in their brief, they provide charity care to indigent and very sick women who can't travel. So it's a purely intrastate activity. My question isn't, I understand your answer on the commerce clause, and you've heard my aside on it, but my question goes to vagueness. What notice is there to a physician who's performing this type of procedure that he or she is violating the statute? If they say, well, it's only in San Francisco, it's completely intrastate, how does a physician know whether or not the statute is going to be violated? I think the jurisdictional element in the statute is designed to implement the commerce clause jurisprudence. And the commerce clause jurisprudence is that when Congress regulates activity that as a category is commercial, then aggregation, a la Wickard, is permissible, and a particular instance of charity care, like the doctor in your hypothetical, or like the charity cannabis club in Raich, can't be separated out on the ground that that individual provider is permitted. And that individual provider chooses to provide the service for free. I understand your legal argument. My only question was how is the physician to know, and I guess your answer is, it covers everybody. I think it probably does, but I see the probably is where you get in trouble on vagueness. When a physician says, okay, I think, am I covered or not, and your answer, Representative Governor, is probably. My answer is yes, and the only reason I have an element of hesitation is that it is a challenge that was never asserted against us. Yes, I understand. The only reason you're hesitating is you're not sure. I cannot always anticipate every possible argument that could have been made, but was not. Thank you, counsel. Thank you. The case just argued will be submitted. Thank you all very much for an extremely helpful argument. The court will stand in recess for the day.
judges: Reinhardt, Thomas, W. Fletcher